MERCHANTS & PLANTERS BANK *v.* SPEARS.

4-9693                                       243 S. W. 2d 751

Opinion delivered November 5, 1951.

Rehearing denied December 3, 1951.

*Elton A. Rieves, Jr., Nance & Nance* and *Hale & Fogleman,* for appellant.

*Bailey & Warren,* for appellee.

ED. F. McFADDIN, Justice.   This suit stems from a dispute between rival groups in the Merchants & Planters Bank of West Memphis. Appellants constitute the majority faction and are directors of the Bank. Appellees, the minority faction, filed suit to require the Bank and the appellants to recognize the appellees as stockholders. From a decree in favor of the appellees there is this appeal.

The capital stock of the Bank consists of 500 shares. On December 12, 1949, appellants, Smith, Cooper, Johnson, McCaa, McKee, Johnson, *et al.,* owning or controlling 285 shares, entered into a voting trust agreement which provided, *inter alia,*

"The said parties shall at all times vote their stock as a unit. The decision as to the way said stock shall be voted on any issue shall be determined by the majority of the stock covered by this agreement.

. : . .

"The parties hereto agree that they will not sell any stock covered by this agreement to anyone not a party to the agreement.

. . . .

"This contract shall remain in effect for a period of ten (10) years from the date of execution of same, unless sooner cancelled by mutual agreement of all parties hereto."

At the time the said voting trust agreement was signed Jack Rich owned 163 shares, and his brother-in-law, B. G. Dickey, owned 52 shares; and these constitute the remaining 215 shares against which the voting trust agreement was apparently directed. Rich was one of the directors of the Bank in 1949; but when he learned of the said voting trust agreement he resigned as director, and removed from the Bank the accounts which he controlled, although he and Dickey retained all of their stock in the Bank, except the 20 shares now to be discussed.

On November 27, 1950, Jack Rich sold five shares of his bank stock to each of the four appellees, Spears, O'Bryant, Fallis and Wood. Each purchaser paid Rich $1,250 which was 2½ times the face value of the stock, even though the book value at that time was probably 3.9 times the face value. Each of the purchasers was a trusted friend and business associate of Jack Rich; and Rich testified that it was his thought that three of these men might become directors in the Bank, in which he held such a large block of stock, but that he would not

be a director because he felt the other directors had evidenced animosity against him by the adoption of the voting trust agreement. Each of the four appellees is a good business man; and it was frankly stated by the attorneys for the appellants in the oral argument before this Court that the only thing wrong with any of the appellees is the close association with Jack Rich.[1]

Among other stock certificates, Rich held Certificate No. 32 for 20 shares of stock in the Bank. On November 27, 1950, he endorsed this certificate in blank and forwarded it to the Bank by mail with a letter reading:

"I enclose Capital Stock Certificate No. 32 for twenty shares of stock in the Merchants and Planters Bank. This stock has been sold, and I ask that you reissue as follows and mail to me for delivery.

"J. H. Spears ................................................................5 shares
L. R. O'Bryant ............................................................5 shares
R. R. Fallis ..................................................................5 shares
James Wood ................................................................5 shares"

The majority faction (appellants) in charge of the Bank refused to comply with Rich's direction that the shares be issued to the four appellees. Also, at a directors' meeting on December 12, 1950, the majority: (1) advanced the annual meeting of stockholders from the second Tuesday in January (as it had been), to the first Wednesday of January of each year beginning in 1951; and (2) closed the stock books against transfer for a period of forty days prior to any annual stockholders' meeting. At the same meeting the directors adopted "Resolution Number 4," which reads:

"That no one shall be eligible to serve as a director of this bank who is an officer of, or member of a board of any competitive institution· of banking in Crittenden County, Arkansas, or whose business connections, interests, or conduct, are hostile to or antagonistic to the wellbeing of this institution."

---

[1] The State Bank Commissioner testified in the Chancery Court that his Department would approve the transfer of the stock to the appellees. (See § 67-318 Ark. Stats.)

On December 20, 1950, appellees filed suit, alleging that each of them had purchased from Jack Rich five shares of stock in the Bank; that appellants had refused to allow the stock to be transferred to appellees; and prayed that appellants be mandatorily enjoined to transfer the said stock certificates, and recognize appellees as the shareholders.

On January 25, 1951, appellees filed amendment to the complaint, alleging that at the so-called annual stockholders' meeting on January 3, 1951, the appellants, as the majority faction in the Bank, had arbitrarily and illegally refused to admit appellees as stockholders; and had refused to count votes cast for appellees, Spears, Wood and O'Bryant for directors; and that the said three appellees received more votes than three of the persons whom the appellants claimed to have been elected as directors. In the amendment, appellees prayed, *inter alia,* that they be issued their five shares of stock, that the meeting of January 3, 1951, be declared void, that a new stockholders' meeting be called.

The cause was heard by the Chancery Court and resulted in a decree in favor of the appellees. The learned Chancellor used this language:

"The Court is of the opinion that the defendants totally failed to allege facts in their answer sufficient to justify their action in refusing to recognize the transfer and that the evidence offered in support of their pleadings likewise failed to justify such action.

"The integrity of the transferees is admitted and the main objection to them seems to be that they will be representatives of an alleged hostile stockholder and, as such, will be passing upon matters of vital importance to the Bank.

.  .  .  .

"It is, therefore, the holding of the Court that the transferor had the right to sell and the transferees had the right to purchase the Stock Certificate in question and the order will be to the effect that Stock Certificate

Number 32 be cancelled and reissued in the names of the plaintiff, five shares each, and that such transfer be made upon the books of the Bank.''

The Chancery Court also ordered that a meeting of the stockholders be held for the purpose of conducting a legal election for directors. From the decree in favor of the appellees, the appellants prosecute this appeal, and argue, here, these points:

(1)—The Stock Certificate No. 32 was never legally delivered by Rich to the appellees, nor by the appellees to the Bank.

(2)—The appellees were not *bona fide* stockholders, but were merely representatives of Rich.

(3)—The majority had, and has, the right to refuse to allow any of the appellees to be directors because of Resolution No. 4.

With becoming candor the appellants say:

''At the outset counsel would suggest that they are familiar with the general rules of law governing the transfer of bank stock and stock in business corporations; that *ordinarily* the motive of one seeking to transfer stock may not be questioned; and that stock may be transferred for the purpose of qualifying one to become a member of a board of directors. It is submitted, however, that this is no ordinary situation, to which the general rule may blindly be applied, . . .''

The rationale of appellants' argument is, that Rich's conduct and declarations reflected an intention to greatly damage the Bank; and that, appellants, as the majority stockholders and directors, occupied a highly fiduciary relationship to the Bank and were justified in doing all that they did in their efforts to protect the Bank against the machinations of Rich.

It is impossible to clear the record of the ill will and personality ''digs'' that have been injected into the case. The appellants say that when the bank was organized, it was orally agreed that no one person would ever seek to obtain a majority of the stock of the Bank; and

that the appellants entered into the voting trust agreement only after they had learned that Rich was secretly acquiring stock and had actually obtained 42 per cent. of all of it. Rich is not a party to this case but was the main witness for the appellees, and claims that in selling the stock to the appellees and in persuading them to be willing to become directors he was trying to bring about harmony. We do not decide the personal grievances as between Rich and appellants, but only the justiciable rights of the respective parties to this litigation. Businessmen of the caliber of the appellants and the appellees and Jack Rich should certainly compose[2] their differences for the best interest of the Bank and the community.

After a careful study of the entire record we reach the unanimous conclusion that the Chancery decree should be affirmed. The directors had the legal right to change the date of the annual stockholders' meeting from the second Tuesday in January to the first Wednesday in January (which in the year 1951 moved the meeting from the 9th of January to the 3rd of January.) "Also, assuming—but not deciding—that the directors had the legal right to pass a resolution closing the stock books against transfer for as long as 40 days prior to the annual meeting, nevertheless the exercise of these powers by the directors . . ." must have been in good faith and must have operated prospectively only, and must not have been done so as to defeat the rights of the appellees which arose prior to the meeting of December 12, 1950, at which such resolutions were passed. We find: (a) that the appellants' refusal to transfer the stock to appellees and the appellants' action in advancing the date of the annual stockholders' meeting, and in adopting Resolution No. 4, were acts, all in furtherance of the majority's plan to prevent Rich's associates from having any voice in the affairs of the Bank; and (b) that the Bank and the appellants are without any sufficient reason for refusing to transfer the stock and for refusing to recognize appellees as *bona fide* shareholders. The stock should

[2] We use the word, "compose," in accordance with the meaning given in the dictionary: "To free from agitation or disturbance; to tranquilize, settle, or sooth; to calm; to quiet."

have been transferred to the appellees in accordance with Rich's letter of November 27th; and the appellees should have been recognized as stockholders and the votes counted for them as directors at the annual stockholders' meeting.

"The chancery court directed that a special stockholders' meeting be held in October, 1951, for the purpose of electing directors. But since only a short time now remains until the annual stockholders' meeting in January, 1952, and since by this opinion the appellees are made stockholders of record as of Nov. 27, 1951, we perceive no reason for a special stockholders' meeting to elect directors to be held prior to the annual meeting in January, 1952. We therefore delete from the chancery decree the provision for a special stockholders' meeting to elect directors. With this exception only, the decree of the chancery court is in all things affirmed.''